IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

Case No. 09-062943 (07)

---

RAZORBACK FUNDING, LLC, et al.,

      Plaintiffs,

vs.

SCOTT W. ROTHSTEIN, et al.,

      Defendants.

---

DAY 2 - MORNING SESSION

DEPOSITION OF SCOTT W. ROTHSTEIN

DATE TAKEN:      December 13, 2011
TIME:          8:30 a.m. - 11:08 a.m.
PLACE:        James Lawrence King Federal
               Justice Building
               99 N.E. Fourth Street
               Courtroom 11-3
               Miami, Florida 33128

Examination of the witness taken before:
Michele L. Savoy, Registered Professional Reporter
United Reporting, Inc.
1218 S.E. Third Avenue
Fort Lauderdale, Florida 33316
(954) 525-2221



EXHIBIT
6

1   and, obviously, no audit could be allowed to be done.

2   And, actually, as far as I know, no audit was ever done.

3       Q    So that the $100-million of the Ponzi went out

4   without even Ponzi pretense?

5       A    Ponzi pretense?

6       Q    Yes, how about that?

7       A    Yes.  I think that should be in the

8   dictionary, but yes.

9       Q    So they actually stole the funds before you --

10  before the Ponzi could be implemented to back up the

11  theft of the funds; would that be a correct way to state

12  that?

13      A    I think the best way to state it, Mr. Scherer,

14  would be that we needed funds to pay off other Ponzi

15  debts, and so we were taking with both hands and

16  worrying about the paperwork later.

17      Q    Was that also, in part, because of the greater

18  velocity of the payments you had to make to keep the

19  Ponzi going, and, therefore, you had to steal even

20  greater amounts of money?

21      A    Yes, sir.

22      Q    And your operation at your office, as well as

23  Frank Preve, just couldn't keep up with it?

24      A    That's correct.

25      Q    Mathematically, I guess, somebody could have

 1    that, of you taking them out and putting George in the

 2    place of -- I presume that would be George Levin and

 3    Banyon?

 4        A    My recollection is that he was not in favor of

 5    it.

 6        Q    Okay.  I believe the email was a March '09

 7    email, not in -- so it was earlier.

 8             Okay.  So the -- and why was he not in favor

 9    of it?

10        A    He would have made less money.

11        Q    Now, in your opinion, did TD Bank play an

12    important role in this Ponzi scheme?

13             MS. ROTHCHILD:  Objection to form.

14        A    Yes.  They were critical.

15             MR. SCHERER:  Sure.  May I understand

16        what the objection is?

17             MS. ROTHCHILD:  No foundation --

18             MR. SCHERER:  No foundation.

19             MS. ROTHCHILD:  -- and leading the

20        witness.

21             MR. SCHERER:  Okay.  Thank you.

22             MS. ROTHCHILD:  Are we having a standing

23        objection to that?

24             MR. SCHERER:  Yeah.  You may have a

25        standing objection, like yesterday, to leading

```
1          questions; and if you want foundation, go

2          ahead and make that and I'll see if it's valid

3          or not, in my mind.

4               MS. ROTHCHILD:   Thank you.

5     BY MR. SCHERER:

6          Q    So let me direct your attention to the role

7     that TD Bank played in this, in your Ponzi scheme.

8          A    They were critical to it.

9          Q    In terms of the components that you view as

10    critical, how does TD rate?

11         A    Do you want it on a scale of one to ten --

12         Q    Yeah.

13         A    -- ten being the most important?

14         Q    Yes.

15         A    They were a ten.

16         Q    And why do you say that?

17         A    Because they were assisting me in putting fake

18    balance statements into the hands of my investors.  They

19    were critical in providing real letters to go on top of

20    the fake balance statements.  They were critical in the

21    fact that they had TD Bank employees actually handing me

22    those phony statements in front of the investors; and

23    Frank Spinosa was a fantastic advocate for our firm's

24    supposed financial condition, as well as on several

25    occasions actually verifying phony balances.
```

1    investor who was to be paid with that money.

2              So the defendants' money would go into that

3    account.  Okay?

4        Q    Right.

5        A    And then it would be locked in there, and the

6    only place it would go would be to the investor for whom

7    it was designated.

8        Q    So was the lock letter then incorporated into

9    the "shows," as you call them, with TD Bank and the

10   investors?

11             MS. ROTHCHILD:  Objection to form.

12   BY MR. SCHERER:

13       Q    How was the lock letter used?

14       A    Okay.  It was utilized as part of the package

15   that we gave.  The main purpose of it was to give an

16   additional false sense of security to our investors.

17       Q    Now --

18       A    And I believe you touched on, there were two

19   forms of the lock letters.

20       Q    Thank you.  I had gotten interrupted by my

21   paralegal there, bringing -- it's a pretty expensive

22   paralegal.

23             And then you say there were two forms.  How

24   did the -- how did that develop?

25       A    The first thing that happened was, when they

1   told us that we required they wanted this, I needed, of

2   course, to see if it was possible.  So I got in touch

3   with Mr. Spinosa, and I told him, specifically, what I

4   needed.

5           I said, I need this letter.  I said, what I am

6   going to do -- because I wanted to make it as easy as

7   possible for him.  I'm going to say:  I'm going to draft

8   the letter for you.  I'm going to send it to you.  It's

9   going to say that these funds can't be put anywhere.

10  Okay.  All I need you to do is sign the letter.

11          And he was specifically told at that time by

12  me, I don't care what actually happens to the account,

13  but I need the letter signed.

14     Q    Okay.  Now, do you have a memory of about how

15  many lock letters we should be looking for?

16     A    You know, I would say probably more than a

17  dozen.  I mean, once we lock the account, you know, it

18  shouldn't be more than that.

19     Q    Okay.

20     A    I don't have a specific recollection,

21  Mr. Scherer.

22     Q    All right.  Did Mr. Spinosa sign -- well, let

23  me ask it differently.

24          Did you forge his signature on lock letters?

25     A    No, sir.

1    Q    Okay.  So that all of the lock letters that we

2  can find that appear to be signed by Mr. Spinosa, were,

3  indeed, signed by Mr. Spinosa?

4    A    Both types: the ones that I prepared for his

5  signature line, and then we eventually had him preparing

6  one -- well, I actually prepared it, sent it to him,

7  told him to place it on his letterhead, to sign it and

8  send it back to me.

9         So it eventually became just a single letter,

10  as opposed to a letter from me being cosigned by him.

11    Q    Okay.  Did he ever tell you, or did anybody at

12  TD ever tell you, that these lock letters don't mean

13  anything, they can't lock up anything?

14    A    Sure.  I had that discussion, actually, with

15  Roseanne Caretsky and Mr. Spinosa.

16    Q    Okay.  Tell us about that.

17    A    The conversation with Ms. Caretsky was the

18  first conversation which instigated the conversation

19  with Mr. Spinosa.

20    Q    Okay.  Take them one at a time for us, please.

21    A    At some point in time she actually asked me

22  what that letter was.  We were talking about it in one

23  of my trips to the bank, and she asked me just -- it was

24  more as matter of fact:  Do you know what these are for?

25         I said, you're going to have to talk to Frank.

1  Everything was always, you're going to need to talk to
2  Frank.
3          She said, I don't even know how this really
4  could work because you could move money in and out of
5  accounts online.
6          I said, just talk to Frank about it.
7          My recollection is that she then talked to
8  Frank about it, and he said something to the effect,
9  just notate the account and let me worry about it, that
10  any questions pertaining to it, should come back to me.
11     Q    All right.
12     A    That's basically where we were, and I had a
13  similar conversation with Mr. Spinosa.
14     Q    Okay.  Tell me -- you had a similar
15  conversation with him, as well?
16     A    Well, I asked him, I said, do we have an
17  issue -- at some point in time, I asked him, do we have
18  an issue with these lock letters?
19          And Frank, being the good soldier that he was,
20  always said, you don't have any issues.  That was
21  Frank's best line:  You do not have any issues with the
22  lock letters.
23     Q    I want to direct your attention to a meeting
24  in Mr. Spinosa's office on -- in Cypress Creek, and I'll
25  get you the date later on when I get the document.

1    procedure to make sure they're implemented properly?

2            ALL PRESENT:  Objection to form, lack of

3        foundation.

4            MR. SCHERER:  Okay.

5    BY MR. SCHERER:

6        Q    All right.  You may answer that.

7        A    Okay.  The answer is yes.

8        Q    Okay.  Just in case I'm wrong on that lack of

9    foundation, would you tell us what was discussed

10   concerning the lock letter and the bankers' concerns

11   that were raised at that meeting?

12       A    Sure.  It was brought up -- it was discussed

13   by Mr. Damson and by Ms. White with Mr. Spinosa that

14   they wanted to understand the mechanism behind it.

15   Frank actually gave a fairly long answer, and it was to

16   the effect that TD Bank is one of the largest banks in

17   the country.  They have all kinds of the newest computer

18   equipment and the like, that they are very used to doing

19   this; they were not the first people to ever request

20   this, and they can rest assured that their money is

21   secured.

22       Q    Now, Mr. Spinosa had -- let me ask this, and

23   then I'll get to Mr. Spinosa's contact with these folks

24   prior to that.

25            The meeting at -- on that day was also to

```
 1    convince the Coquina people to make a big investment,

 2    their biggest investment up to that point --

 3         A     That's correct.

 4         Q     -- do you recall that?

 5         A     It was what I would say heightened due

 6    diligence.

 7         Q     Do you remember the size of investment?

 8         A     I do not.

 9         Q     If I told you 20 -- $20 million, $22 million,

10    does that ring a bell in terms of that deal?

11         A     It --

12               MS. ROTHCHILD:  Object to form.

13         A     It doesn't.  It doesn't ring a bell.  I know

14    it was tens of millions of dollars.  I don't recall the

15    exact size, but it was a giant investment that we needed

16    desperately to keep the Ponzi scheme going.

17         Q     Do you recall at the time of the meeting with

18    Mr. Spinosa whether the punitive defendant had already,

19    allegedly, put that money in the trust account for the

20    benefit of the purchasers of that settlement?

21         A     My recollection is that at that time it was

22    prefunded, but you can check the emails to verify one

23    way or the other.

24         Q     Okay.  And do you remember whether the subject

25    of that money being locked up came up at that meeting
```

1    with Mr. Spinosa?

2        A    It did.

3        Q    All right.  Tell us about what you recall

4    about that.

5        A    He was direct -- Mr. Spinosa was directly

6    questioned by Ms. White and Mr. Damson as to the

7    existence of funds.  Mr. Spinosa told them the amount

8    that was in the account -- it was in excess of whatever

9    the amount was, because it would have included -- as

10   Frank knew, it would have included attorney's fees to

11   me, as well.

12            So he gave an in-excess-of number, if I recall

13   correctly, said the money was in the account and it

14   can't go anywhere.

15       Q    And do you know -- did you know at that time

16   that he made that representation to Kathleen White and

17   Barry Damson, how much was actually in the account?

18       A    Yes.  I believe it was $100.

19       Q    Now, Mr. Spinosa had a phone call with these

20   folks, you know, a month or two before --

21       A    Yes.

22       Q    -- do you recall that?

23       A    I certainly do.

24       Q    And the phone call was set up by emails to

25   have this conference call with Mr. Spinosa and you; do

```
 1   you remember who else was on the call?

 2        A    I don't remember who else was on the call.

 3   Mel Klein may have been on it, but I don't recall.

 4        Q    Mel Klein, Damson and Kathleen White.

 5        A    I'm certain that that's correct.

 6        Q    And do you recall that anything about that

 7   conversation -- I'm going to get to the gist of it --

 8   but that anybody was instructed not to speak and who

 9   could speak and that sort of thing from Coquina before

10   the conversation?

11        A    Yes.  Barry was going to ask the questions --

12        Q    Yes?

13        A    -- and I specifically notified Mr. Spinosa, I

14   believe in an email.  I told Mr. Spinosa, in the

15   email -- you should have a copy of it -- specifically:

16   These are the questions Barry is going to ask, no

17   others; these are the answers you're to give, nothing

18   else, and the call will be over.

19        Q    And it was in reference to the lock letters

20   and their funds being locked up, now that they were

21   going to ramp up and put more money into the Ponzi?

22        A    It was something to that effect, yes.

23        Q    And do you remember, did Mr. Spinosa follow

24   the script?

25        A    To the letter.
```

1      Q    -- or some low amount of money?

2      A    No.

3      Q    I mean, if she's asking for the account

4   statement, repetitively, and -- were there ever monies

5   in those accounts, other than nominal amounts?

6      A    The only time money was in those accounts, to

7   the best of my recollection, was on the day of payment.

8   The process would be: the account would remain with a

9   minimum balance.  I think they all had $100 in those --

10   excuse me, in each of the locked accounts, just to

11   maintain the accounts.

12            On the day that Irene would notify us that

13   payment was due to a particular investor, we would

14   transfer money from whatever account, usually the 0923

15   account, which was our -- the large, I guess you would

16   call it, Ponzi account.  We would transfer money from

17   there, or wherever else we needed to transfer it from,

18   into that, quote, unquote, locked account and then write

19   it out to the investor so that when the investor got the

20   funds, it was coming from the proper account.

21      Q    And when you would ask for the -- when would

22   you ask for the account balances so that you could do

23   the switch?  It seems like that would always be before

24   the investor put the money in.  Did you not ask for

25   the --

1       A    On, yeah, no, it was way before that, sure.

2       Q    As a part of the show?

3       A    Yeah, because the investor's money was going

4   into the general account.  The investor's money wasn't

5   going into -- number one, it would never go into a

6   locked account because that was supposed to be -- if it

7   was a real deal, it would have been the defendant money

8   going into the locked account.  There was nothing in

9   there.

10           Those accounts remained vacant until the day

11   the payment was due, and only on the date payment was

12   due or possibly, if we were doing it the day before, but

13   I doubt it; we were always so strapped for cash to do

14   this.  So it would have been the day of, money goes in

15   and then right out.

16       Q    But did anybody from the Weston branch ask you

17   why you were coming all the way to Weston to get an

18   account statement with a minimal balance in the account

19   statement when you could look at it on the screen in

20   your office?

21       A    No.

22       Q    Or you could print it on the screen from your

23   office and give it to whomever you needed to give it to?

24       A    No.  Not only that, but I would -- all banks,

25   even in the computer age, send out paper statements.  We

1     A     The only thing that I had learned about from

2     discussions with Sara --

3     Q     Sara?

4     A     Sara Coen.

5     Q     Okay.

6     A     -- was that she had spoken to Mr. Kahlid and

7     said that when I wire the money, there should not be an

8     issue and to let my bank know that we were wiring the

9     funds.

10    Q     And did you let your bank know that -- that is

11    TD Bank know, in advance, that you were going to be

12    wiring money to Morocco.

13    A     I called Mr. Spinosa before the wire went.  I

14    said, I'm going to be wiring a large sum of money from

15    my account to an account in Morocco and to please make

16    sure that it went through immediately.

17    Q     Do you have any information about -- well, let

18    me ask this:  What did -- Mr. Spinosa, how did he

19    respond that?

20    A     No problem.

21    Q     Was there any discussion about them -- you

22    know, Morocco being a problem place to wire money to

23    from a bank?

24    A     Not from him, no.

25          MR. KOPAS:  Plaintiff's Exhibit 38, it's

```
 1        TD/Razor 1 and 2.
 2             (Thereupon, a document was marked as
 3   Plaintiff's Exhibit No. 39 for Identification.)
 4             THE WITNESS:  Thank you, sir.
 5   BY MR. SCHERER:
 6        Q    I think the way we -- I think we go to the
 7   back page and read the back page first, and then we go
 8   forward.
 9        A    Yes.
10        Q    I have difficulty with that one, sorry.
11        A    It's like Hebrew; we read backwards.
12        Q    I'm having trouble, but I'm learning.
13             Would you go to the back page?  It appears to
14   be an e-mail from you to Mr. Spinosa.
15        A    Yes.
16        Q    And you -- would you read what you state there
17   to Mr. Spinosa?
18        A    Yes.  It says, "Subject:  This is the wire."
19   It says, "Make sure it flies at 9:00 a.m.  Love you.
20   Me."
21        Q    Okay.  And then --
22        A    And then, attached to it is all the other wire
23   information.
24        Q    Right.
25        A    Looks like I cut and pasted it.
```

Page 240

1      Q     Yeah.  And then do you have a -- there is a --
2    an e-mail that appears to be from Wendy Tinachio.  Do
3    you know who she is?
4      A     That's Frank's assistant.
5      Q     Okay.  And she says -- and then it -- down at
6    the bottom it's Frank Spinosa:  This is the wire.
7            You see that?
8      A     Yes.  It's the same heading from my original
9    e-mail.
10     Q     And then you have an email from Frank Spinosa
11   to you, October 27th, '09, "Subject:  This is the wire."
12           Right?
13     A     Actually, first is an email from Wendy to
14   Frank Spinosa:  "This is the wire."
15     Q     Thank you.
16           You're reading from the bottom.  You're again
17   better than I am at that.  Thank you.
18           And then at the top it's -- it's Frank to
19   you -- Mr. Spinosa to you?
20     A     Yes, telling me that he'll keep monitoring it
21   but it should go out at any time.
22     Q     Thank you.
23           Now, the 27th was an interesting day for you,
24   wasn't it?
25     A     Are you referring to the day I left?

Page 272

1    looks like a copy of a PowerPoint presentation.  And --

2    Q    Have you ever seen that before?

3    A    I saw it but my recollection is, is that I saw

4    it post my turning myself in.

5    Q    Did you use a PowerPoint presentation ever

6    when you were making your pitch to the various

7    investors?

8    A    No.

9    Q    Thank you.

10        Let me switch gears a little bit.  Yesterday I

11   talked to you about your pitch, if you will, your --

12   what you said to investors in order to convince them to

13   invest in this Ponzi scheme over time.

14   A    Yes.

15   Q    And I think we went over it in quite -- in

16   some detail but I have just a few follow-up questions.

17        How would you respond when an investor would

18   ask you whether or not this investment, Ponzi investment

19   was taking advantage of a plaintiff or some poor

20   plaintiff that was being taken advantage of?

21   A    I told the investor that it was just the

22   opposite, actually, that these people were desperate for

23   money, that they were in dire straights, and it was in

24   fact helping them.

25   Q    How about too good to be true?  I mean, did

United Reporting, Inc.
(954) 525- 2221

1    investors say "these returns are so high, they're too

2    good to be true, there must be something wrong with

3    this"?

4         A     From time to time certain of the investors

5    did.  But I allayed their fears by explaining the

6    process and explaining that based on the -- let's call

7    it the potential notoriety, that the event that

8    underlined the transaction, meaning harassment, the

9    whistle-blowing, could cause the various defendants if

10   it was exposed, that they were certainly willing to pay

11   those huge sums of money.

12            By the same token, that fed into my ability to

13   allay their fears pertaining to the plaintiff.  It

14   enabled me to tell them, again, as we discussed

15   yesterday, that a plaintiff making whatever it might be,

16   30, 40, 50, $60,000 a year, if she is taking a discount

17   off a $2 million to her, even down to a million dollars,

18   it's more money than she would ever be able to

19   accumulate in a lifetime.  So that allayed their fears.

20        Q     Did you ever tell --

21        A     I'm talking about, obviously, the fears of the

22   innocent investors.

23        Q     Right.

24        A     The other ones didn't have the same fear.

25        Q     Okay.  Did you ever tell innocent investors

1  anything to the extent that the defendant -- why the

2  defendant insisted on a periodic payment even though

3  some of them were only two months, three months, four

4  months, because the defendant wanted to get the

5  plaintiff out of the place of employment long enough so

6  that the cover wouldn't be blown or the confidentiality

7  wouldn't be blown?

8       A    The whole idea of the extended payments, no

9  matter what period of time was, was to ensure some

10  modicum of confidentiality.  Along with that, when they

11  would question, for example, the short period where we

12  were making payments over two, three, four months, we

13  always talked to them about the fact that we gave a very

14  big confidentiality -- breach of confidentiality warning

15  to the plaintiff, that the plaintiff could lose all

16  their money if they breached confidentiality.  So it

17  was, in essence, putting the fear of God in the

18  plaintiff.

19      Q    Now, did you invite the investors to search

20  the cases in the file where plaintiffs have breached

21  confidentiality and defendants had tried to sue them to

22  get their money back --

23      A    Yes.

24      Q    And there are very few of those cases ever --

25  nationally ever?  Is that something that came up from