**Page 1**

1  UNITED STATES BANKRUPTCY COURT
   SOUTHERN DISTRICT OF FLORIDA
2  FORT LAUDERDALE DIVISION
3
          Case No. 09-34791-BKC-RBR
4
5  In re:
6  ROTHSTEIN ROSENFELDT ADLER, P.A.,
7  Debtor.
   _____/
8
9
10
11
12
13       GENOVESE JOBLOVE & BATTISTA, P.A.
         200 East Broward Boulevard, Suite 1100
14       Fort Lauderdale, Florida 33301
         Wednesday, May 19, 2010
15       10:40 a.m. to 4:00 p.m.
16
17            VOLUME I
18
         2004 EXAMINATION
19
             OF
20
         ROSEANNE CARETSKY
21
         taken pursuant to notice
22       on behalf of Herb Stettin, Trustee.
23       - - - - -
24
25

**Page 2**

1  APPEARANCES:
2
   GENOVESE JOBLOVE & BATTISTA, P.A., by
3     THERESA VAN VLIET, ESQUIRE and
      JESUS SUAREZ, ESQUIRE
4  on behalf of Herbert Stettin, Chapter 11 Trustee.
5
      BILLING, COCHRAN,
6     LYLES, MAURO & RAMSEY, P.A., by
      W. TUCKER CRAIG, ESQUIRE
7  on behalf of Roseanne Caretsky.
8
      GREENBERG TRAURIG, P.A., by
9     GLENN E. GOLDSTEIN, ESQUIRE,
      JOHN HUTTON, ESQUIRE and
10    DONNA EVANS, ESQUIRE
      on behalf of TD Bank.
11
12    SAMUEL J. RABIN, JR., P.A., by
      SAMUEL J. RABIN, JR., ESQUIRE
13 on behalf of Frank Spinosa.
14
      SCHLESINGER & COTZEN, P.L., by
15    MICHAEL J. SCHLESINGER, ESQUIRE
      on behalf of Frank Spinosa.
16
17 TABAS FREEDMAN SOLOFF MILLER & BROWN, P.A., by
      JASON PEAR, ESQUIRE
18 on behalf of Centurion Structured Growth, LLC.
19
      TRIPP SCOTT, P.A., by
20    JOHN G. BIANCO, III, ESQUIRE
      on behalf of Morse Operations and
21    Edward and Carol Morse.
22
   CONRAD SCHERER, ATTORNEYS AT LAW, by
23    JESSICA L. KAUFMAN, ESQUIRE
      on behalf of Razorback Funding, et al.
24
25

**Page 3**

1       ALSO PRESENT:
2    BERKOWITZ DICK POLLACK & BRANT
     RICHARD S. FECHTER, CPA
3  On behalf of Herbert Stettin, Chapter 11 Trustee.
4
        MS. KELLY CRAMER, REPORTER
5       for the Daily Business Review.
6
        MR. PETER FRANCESCHINA, REPORTER
7       for the Sun-Sentinel.
8
        - - - - - -
9
10          I N D E X
11
   WITNESS              DIRECT   CROSS
12 ROSEANNE CARETSKY
      By Ms. Van Vliet        4
13    By Mr. Craig            --
14
      EXHIBITS MARKED FOR IDENTIFICATION
15
      Number           Page
16    55               28
      56               36
17    57               39
      58               46
18    59               80
      60               83
19    61               102
      62               109
20    63               112
      64               114
21    65               117
      66               124
22    67               126
      68               136
23    69               146
      70               149
24    71               158
25

**Page 4**

1  Thereupon:
2       ROSEANNE CARETSKY,
3  after first being duly sworn, was examined and
4  testified under oath as follows:
5       MR. CRAIG:  Before we get started, in
6  response to the duces tecum portion of the depo
7  notice -- excuse me, exam notice, Ms. Caretsky is not
8  in possession of any documents responsive to that
9  notice.
10      MS. VAN VLIET:  Okay.  Thank you for that.
11      Could you swear the witness, please.
12      THE COURT REPORTER:  I already did.
13      MS. VAN VLIET:  Oh, you did.  I wasn't paying
14 attention.
15          DIRECT EXAMINATION
16 BY MS. VAN VLIET:
17   Q  Ms. Caretsky, where are you employed?
18   A  TD Bank.
19   Q  How long have you been employed by TD Bank or
20 its predecessor, Commerce Bank?
21   A  It will be three years next month.
22   Q  Okay.  Prior to starting to work with TD
23 Bank, where did you work?
24   A  I worked for SunTrust Bank for three years,
25 and before that I lived in New York, where I worked



EXHIBIT 8

1 (Pages 1 to 4)

**Page 9**

1  not a question pending -- (beep). I'm going to kill
2  that e-mail notification thing. As long as there's
3  not a question pending, we'll take a break, not a
4  problem. If you need a break otherwise, let me know,
5  not a problem.
6      There will be times when your lawyer and
7  perhaps other in the room may object to a question.
8      A  Okay.
9      Q  Let them state their objection for the
10  record, so give a little bit of time for them to do
11  that after a question.
12      A  Okay.
13      Q  Again, so the court reporter doesn't have a
14  hard time, and you're expected to answer the question
15  unless your counsel instructs you not to answer.
16      A  Okay.
17      Q  Other than that, things should go fairly
18  smoothly. I will probably take a ten minute break,
19  you know, sometime mid-morning or about an hour or so
20  into it, and then we will take a short lunch break,
21  and then keep going through the afternoon, okay?
22      A  Okay.
23      Q  How long had you known Spinosa at the time
24  you made these calls for the interviews at Commerce
25  Bank?

**Page 10**

1      A  Well, we didn't work directly together. I
2  mean, I worked for the company for three years. I
3  don't know exactly when we met. He was in a different
4  capacity than I was. I couldn't give you an exact
5  time frame.
6      Q  What capacity was he in at SunTrust?
7      A  He ran the business banking for South
8  Florida.
9      Q  Did you, as a branch manager for SunTrust,
10  have interaction with him on a regular basis?
11      A  No, just on occasion.
12      Q  And the occasional interaction that you would
13  have with Spinosa while working at SunTrust, can you
14  generally describe what those kind of interactions
15  were?
16      A  Yeah. We had a business banker who sat in my
17  office, who did business banking for me. He would
18  come out and visit her. He lived in Weston. If he
19  had to do a transaction or something, he would stop
20  into the Weston location.
21      Q  When you eventually were hired at Commerce
22  Bank, were you the branch manager out at the Weston --
23      A  Yes.
24      Q  -- store, this new store that was built?
25      A  Of the -- right.

**Page 11**

1      Q  And Frank Spinosa, what was his role at
2  Commerce Bank at the time?
3      A  He was the regional vice president.
4      Q  Throughout the entire time that you worked at
5  Commerce Bank, then TD Bank after the acquisition,
6  through November 1, 2009, did Spinosa always work in
7  the same capacity at Commerce or TD Bank?
8      A  Yes.
9      Q  How about you --
10      A  Yes.
11      Q  -- were you always in the same capacity?
12      A  Yes.
13      Q  Okay. That capacity being the branch manager
14  at the Weston branch?
15      A  Correct.
16      Q  Now, it sounds like you've made pretty much a
17  career out of banking.
18      Am I right about that?
19      A  Yes.
20      Q  In terms of any other professional jobs, have
21  you ever had anything outside of the banking industry,
22  since in or about 1989 when you started working at the
23  bank as a teller up in New York?
24      A  I did work for the county I lived in for
25  probably a year as a part-time clerk.

**Page 12**

1      Q  Would that be the county in New York?
2      A  Yes.
3      Q  Okay. Now, throughout the tenure of your
4  banking career, have you received training and
5  education professionally through the various employers
6  that you had?
7      A  Yes.
8      Q  And starting with Commerce Bank forward, did
9  you receive training and education from Commerce Bank
10  when you started working for them?
11      A  Yes, um --
12      Q  Was it internal training or external?
13      A  Internal.
14      Q  Describe for me the internal training that
15  you had while working at Commerce Bank?
16      A  I had some computer training. I had -- we do
17  annual harassment training. This is the managerial
18  level. We do harassment training, discrimination
19  training, new product training, small business
20  training. Just trying to think of some other -- we
21  take so many -- a lot of it's online courses also.
22  That's all I can think of at the moment.
23      Q  Okay. And are you required to complete
24  certain traunches of training as a requirement of your
25  job?

Page 17

1    MS. VAN VLIET: Well, we will have to take it
2 up with him.
3 BY MS. VAN VLIET:
4    Q  In addition to -- well, let me ask you this;
5 regardless of what you were taught regarding the
6 Anti-Money Laundering Bank Secrecy Act, Patriotic Act
7 due diligence, Know Your Customer enhanced due
8 diligence, were you required to abide by those
9 instructions.
10    MR. GOLDSTEIN: Object to form --
11    MR. CRAIG: Object to the form.
12    MR. GOLDSTEIN: -- assuming facts not in
13 evidence.
14    MS. VAN VLIET: They aren't instructing you
15 not to answer, so you can answer.
16    THE WITNESS: Yes.
17 BY MS. VAN VLIET:
18    Q  Did you, in fact, abide by those
19 instructions?
20    MR. GOLDSTEIN: Objection, form.
21    MR. CRAIG: Form.
22    THE WITNESS: Yes.
23 BY MS. VAN VLIET:
24    Q  Okay. Now, who introduced you to RRA as a
25 customer?

Page 18

1    A  Frank Spinosa and John Tolomer.
2    Q  Who is John Tolomer?
3    A  John Tolomer is the former Florida bank
4 president.
5    Q  Okay. First of all, do you know how to spell
6 his last name?
7    A  T-O-L-O-M-E-R.
8    Q  And tell me the circumstances of your
9 introduction to RRA.
10    First of all, who from RRA did you meet?
11    A  I received a phone call from Frank saying
12 they are bringing on a new client, "Can you please
13 reach out, make an appointment with the CFO of the
14 company," which I did.
15    Q  And the time period that this phone call from
16 Frank Spinosa happened, when was it?
17    A  It was either October or November of 2007.
18    Q  Okay. And did Spinosa elaborate on who the
19 client was at all?
20    A  I don't remember the exact words.
21    Q  Okay. Regardless of whether you remember the
22 exact words, tell me generally what you remember from
23 that conversation?
24    A  Like I said earlier, they have — they want
25 to bring on a new client. They want me to go out and

Page 19

1 meet with them. It's a law firm. They are going to
2 be opening some accounts with us, and basically go out
3 and get the meeting, so I was the one who was in
4 charge of setting the meeting.
5    Q  And you said you called the CFO.
6    A  Yes.
7    Q  Who was that?
8    A  Irene Stay.
9    Q  Did you arrange a meeting with her?
10    A  Yes.
11    Q  When did the meeting take place?
12    A  It was in that time frame. I think it was
13 the end of October, beginning of November 2007.
14    Q  Where did you meet with her?
15    A  In the RRA offices.
16    Q  In the RRA offices located in downtown Fort
17 Lauderdale on --
18    A  -- Las Olas.
19    Q  What is now the Bank of America building?
20    A  Yes.
21    Q  And when you met with her, did you bring any
22 other representatives from the bank with you?
23    A  Yes.
24    Q  Who?
25    A  Paolo Casabone.

Page 20

1    Q  And who is Paolo Casabone?
2    A  He is a cash manager rep for TD Bank.
3    Q  At the time it would have been Commerce Bank,
4 right?
5    A  Correct.
6    Q  Just so the record is straight, so when was
7 the acquisition of Commerce Bank by TD Bank?
8    A  The actual change of name took place in 2008.
9 The actual change of computer systems when we merged
10 to one family was in September of 2009 --
11    MS. VAN VLIET: Okay. Let me take a break
12 for just a second, if I may. I'm going to be about
13 five minute.
14    MR. GOLDSTEIN: I'm going to do a quick
15 restroom break. I will be two minutes.
16    MS. VAN VLIET: Take five.
17    (Thereupon, a brief recess was taken.)
18 BY MS. VAN VLIET:
19    Q  When we took a break, we were talking about
20 what your conversations, your initial conversations,
21 during your first meeting with Irene Stay were, and
22 you testified that you brought one other individual
23 from the bank with you.
24    I'm sorry, could you give me his name again?
25    A  Paolo Casabone.

**Page 41**

1 account, once you get the paperwork filled out and the
2 signatory cards.
3    A  Meet with the customer. I get the signature
4 cards filled out. I get the corporate resolution
5 filled out, usually come back to the branch and have
6 one of my associates, my assistant manager or CSR,
7 open the account.
8    Q  Who was working with you at the branch at
9 that time as your assistant manager?
10    A  The branch wasn't opened on November 7th, so
11 I did not have an assistant manager at the time.
12    Q  When did the branch open?
13    A  November 19th.
14    Q  On November 19th when it opened its doors,
15 was there an assistant manager in place?
16    A  Yes.
17    Q  Who was that?
18    A  Michael Zuckerberg.
19    Q  Could you spell his last name for the court
20 reporter?
21    A  Z-U-C-K-E-R-B-E-R-G.
22    Q  Who else was working at the branch at that
23 time when it opened on November 19th?
24    A  We had Ricardo Mejia, Ana Tarazona, a
25 gentleman named, Caesar -- I can't remember his last

**Page 42**

1 name, who no longer works there.
2    Q  Okay.
3    A  Tellers we had Tadessa (phonetic) Murray,
4 Jared Jones, Orlando De La Rosa, Chris Grant, Maria
5 Mateo.
6    Q  Mr. Mejia, is he still with the bank?
7    A  Yes.
8    Q  What's his position now?
9    A  Store supervisor.
10    Q  What store?
11    A  Weston.
12    Q  Weston?
13    A  (Witness nods her head.)
14    Q  Now, when you opened the three accounts for
15 RRA out of that branch, in terms of size of their
16 deposits when it was opened, how much of a percentage
17 of your branch's business was RRA?
18    A  When the accounts were opened, it was -- the
19 accounts weren't funded right away, so it wasn't a big
20 part when we opened the branch.
21    Q  How long did it take to fund the accounts?
22    A  I don't remember exactly the time frame.
23    Q  Approximately.
24    A  A few months.
25    Q  And when the accounts were funded a few

**Page 43**

1 months after they were open, was it still just the
2 three accounts?
3    A  Yes.
4    Q  And when those three accounts were initially
5 funded after that point in time, how large a
6 percentage of your branch's business were those three
7 RRA accounts?
8    Hold on, because he wants to object.
9    MR. GOLDSTEIN: Objection, and instruct her
10 not to answer as to the percentage. She can answer as
11 to any amounts, what the significance was, but not
12 percentages vis-a-vis what else was in that branch.
13    MR. CRAIG: Do not answer the question.
14 BY MS. VAN VLIET:
15    Q  What are VIP customers?
16    A  Very important.
17    Q  Was Rothstein, RRA, at any point in time,
18 from the time you opened the accounts through November
19 1, 2009, considered by the bank to be a VIP customer?
20    A  Yes.
21    Q  At what point in time did that occur?
22    A  I mean, I can't give you the exact time.
23 When the relationship and the accounts were funding,
24 we new there were going to be initial accounts being
25 opened, there was a relationship forming. I can't

**Page 44**

1 give you an exact time.
2    Q  Certainly by the beginning of January of
3 2009, it was a VIP, correct?
4    A  Yes.
5    Q  What are the criteria for a VIP customer, for
6 the bank?
7    A  We look at the relationship, balances,
8 referrals, any outstanding loans, credit lines.
9    Q  What of those various factors that you just
10 described caused RRA to be afforded the status of a
11 VIP customer?
12    MR. GOLDSTEIN: Objection.
13    MS. VAN VLIET: Go ahead and answer.
14    THE WITNESS: The relationship, balances they
15 had in accounts, and a possible lending relationship.
16 BY MS. VAN VLIET:
17    Q  First of all, you talk about a "possible"
18 lending relationship --
19    A  Mm-hmm.
20    Q  -- were there ever any loans flowing from the
21 bank to RRA?
22    A  That never came to fruition, no.
23    Q  Was it pursued?
24    A  Yes.
25    Q  By whom?

Page 49

1    Q  Was it a normal process for any client or
2  just VIP clients?
3        MR. GOLDSTEIN: Objection.
4        THE WITNESS: All clients that needed IOLA
5  accounts.
6        (Informal discussion off the record.)
7  BY MS. VAN VLIET:
8    Q  At points in time -- and this is a little out
9  of order, but just generically at points in time in
10  the relationship with the RRA accounts, did you
11  receive complaints from people at RRA that things
12  weren't happening fast enough at the bank to satisfy
13  their needs?
14        MR. GOLDSTEIN: Object to form.
15        THE WITNESS: Yes, during our -- our computer
16  conversion in September of 2009.
17  BY MS. VAN VLIET:
18    Q  And that's the period where it goes from
19  D3000 to Fidelity?
20    A  Yes, that was one of things that changed.
21    Q  There were other complaints as well, in terms
22  of wanting instant access to funds; is that correct?
23        MR. GOLDSTEIN: Objection.
24        MR. HUTTON: Form.
25        MR. CRAIG: Join.

Page 50

1        THE WITNESS: I don't know of there being a
2  complaint of funds not being available.
3  BY MS. VAN VLIET:
4    Q  Do you recall ever receiving e-mails from
5  individuals at RRA asking you to check into wire
6  transfers, for example, being held up at the New York
7  branch?
8        MR. GOLDSTEIN: Objection, form.
9        MR. HUTTON: Objection, form.
10        MR. CRAIG: Join.
11        THE WITNESS: That doesn't sound familiar to
12  me.
13  BY MS. VAN VLIET:
14    Q  When you were originally opening up these
15  accounts for RRA, was there any -- between the initial
16  meeting and when they were actually funded, was there
17  any discussions with the people at RRA with respect to
18  the amount of activity in those accounts?
19    A  No.
20    Q  Between the point in time of the initial
21  meeting and the funding, did you have initial
22  discussions with folks at RRA regarding the accounts?
23    A  Set up of the accounts, yes.
24    Q  Tell me about those.
25        First of all, who were they with?

Page 51

1    A  Most likely it was with Bill Brock, Irene
2  Stay, now its Stay, about the online setup, about
3  merchant services setting up the ability for them to
4  take credit cards.
5    Q  And the online setups they wanted at the time
6  were simply TreasuryDirect?
7    A  Yeah, they signed up for TreasuryDirect, yes.
8    Q  At that point in time, before the accounts
9  were funded, did they also inquire about
10  BusinessDirect?
11        MR. CRAIG: Objection, asked and answered.
12        You can answer.
13        THE WITNESS: I don't remember the exact time
14  frame, but yes, we did set them up.
15  BY MS. VAN VLIET:
16    Q  Do you know when BusinessDirect with them
17  became operational?
18        MR. GOLDSTEIN: Objection.
19        THE WITNESS: I don't know the exact date.
20  BY MS. VAN VLIET:
21    Q  Do you know an approximate date?
22    A  I don't.
23    Q  Okay. Who at the Weston branch was
24  responsible for maintaining the client relationship
25  with RRA?

Page 52

1    A  Me and the entire branch. If I wasn't there,
2  somebody else was to handle any transactions,
3  requests, anything they needed.
4    Q  Was there one individual at the Weston branch
5  where, to coin a phrase, the buck stopped there, that
6  was responsible at the Weston branch in terms of
7  having the ultimate responsibility for the RRA
8  accounts?
9        MR. GOLDSTEIN: Objection to the form.
10        MR. CRAIG: Join.
11        You can answer.
12        THE WITNESS: I'm the store manager. I mean,
13  I -- I take responsibility for what happens in my
14  location.
15  BY MS. VAN VLIET:
16    Q  Okay. Above you -- or outside of the branch,
17  I should say, I don't know whether it's above you,
18  outside of the branch, was there any specific
19  individual who had responsibility within the bank for
20  maintaining the client relationship with RRA?
21    A  Yes.
22    Q  Who?
23    A  Frank Spinosa.
24    Q  Was he always in that role from his
25  introduction of RRA to you to his eventual termination

Page 53

1  with the bank?
2     A  Yes.
3       MR. GOLDSTEIN: Objection.
4  BY MS. VAN VLIET:
5     Q  In terms of the division of efforts of
6  dealing with RRA, was there any division of efforts or
7  responsibilities between you and Spinosa for dealing
8  with RRA?
9       MR. CRAIG: Form.
10       You can answer.
11       MR. GOLDSTEIN: Join.
12       THE WITNESS: I did most of the account
13  opening in my location, the account maintenance, I
14  took direction on when something needed to be done.
15  BY MS. VAN VLIET:
16     Q  When you say you "took direction" on when
17  something needed to be done, from whom did you take
18  direction?
19     A  Either Frank or the client.
20     Q  And how often was Frank the individual that
21  was giving direction to you about what to do with the
22  accounts?
23     A  I can't tell you a specific time of how many
24  times, but there were requests to, "Hey, call Scott,
25  we're going to open new accounts," or "Have you spoken

Page 54

1  to Bill about getting, you know, new accounts?" I
2  mean, it was really about the new accounts being
3  opened.
4     Q  In terms of your interaction specifically
5  with Scott Rothstein, how much, over the period of
6  time that you were involved in the accounts, how much
7  interaction did you personally have, whether
8  telephonically, electronically, or face-to-face with
9  Scott Rothstein?
10     A  It was minimal.  We probably met five times,
11  if I saw him maybe two or three more times, that was
12  it.
13     Q  Did you receive direct e-mail communications
14  from Mr. Rothstein?
15     A  Probably once or twice.
16     Q  When I say "direct," I mean addressed to you
17  as opposed to carbon copied to you.
18     A  Yes.
19     Q  Do you have that understanding in mind?
20     A  Yes, yes.
21     Q  In terms of telephonic call conversations
22  with Rothstein, can you approximate the amount of
23  times that you would have spoken to him telephonically
24  during the entire conduct of the relationship with
25  RRA?

Page 55

1     A  Once or twice.
2     Q  Turning first, then, to your physical
3  meetings with him, apart from the first time when he
4  came in, which you've already discussed, tell me about
5  the other ones as they occurred?
6     A  After the first one, we had another meeting
7  in the RRA offices on Las Olas to discuss a lending
8  relationship.
9     Q  Approximately when was that after the initial
10  meeting in or about November of 2007?
11     A  Maybe a few months later.
12     Q  Okay.
13     A  Again, he came to my -- the local branch in
14  Weston, asked to use the conference room.
15     Q  Approximately when was that after the --
16  using the opening as a point in time that you can
17  remember --
18     A  Yeah.  It's months.  It's months, and I can't
19  say how many months, but it was months.
20     Q  The next?
21     A  Was another two to three visits in the
22  location to pick up copies of statements.
23     Q  Okay.
24     A  I saw him at a networking function.
25     Q  Okay.

Page 56

1     A  And I was having lunch at Bova Grill on Las
2  Olas one day when he walked by.
3     Q  Let's backtrack.
4     A  Okay.
5     Q  The meeting in RRA's offices where I believe
6  you said lending --
7     A  Yes.
8     Q  -- was discussed, who else was present from
9  the bank.  If anyone?
10     A  Michael Woody, Tom te Riele, and Paolo
11  Casabone.
12     Q  And on the RRA side of the table, who was
13  present apart from Mr. Rothstein?
14     A  It was just Mr. Rothstein.
15     Q  Tell me about the discussion that was had
16  during that meeting.  If you can't remember specifics,
17  tell me about it generally.
18     A  I can tell you generally we talked about
19  setting up a line of credit for him.  He had a line of
20  credit over at Gibraltar, and that was probably the
21  extent of it.  We told him the requirements.  At the
22  end of the meeting, we told him what we would need to
23  move forward with the line of credit.  I know there
24  was talk of him having to contact his CPA to get
25  copies of statements.

Page 85

1 Investments' account at TD Bank?
2     A  Yes.
3     Q  Okay.  Turning to the next page of the -- of
4 composite Exhibit 60, which is Bate Stamp No. 001331,
5 comparing these two pages, okay --
6     A  Mm-hmm.
7     Q  -- correct me if I'm wrong, but is the
8 primary difference that the second page is signed by
9 someone -- the purported signature of Mr. Spinosa on
10 the bottom of the page, bottom left-hand --
11         MR. CRAIG:  Form.
12         You can answer.
13         THE WITNESS:  Yes.
14 BY MS. VAN VLIET:
15     Q  As well as a notation on the top of the
16 second page, which says "file" underscore, in
17 handwriting?
18     A  Correct.
19     Q  Do you recognize any of the signatures on the
20 counter-signed copy of the letter, which is Bate Stamp
21 No. 001331?
22         MR. GOLDSTEIN:  Objection.
23         THE WITNESS:  No.
24 BY MS. VAN VLIET:
25     Q  And would you recognize Mr. Rothstein's

Page 86

1 signature if you saw it?
2     A  No.
3     Q  Would you say that you would recognize
4 Mr. Spinosa's signature if you saw it?
5     A  No.
6     Q  Now, you said it refreshed your recollection
7 of whether you had seen the letter or not.
8         Had you, in fact, read this letter?
9     A  Yes.
10     Q  Was that the first time you had ever seen a
11 letter promising those kind of irrevocable
12 instructions with regard to a given account?
13     A  Yes.
14     Q  Did that strike you as odd?
15     A  Yes.
16         MR. CRAIG:  Form.
17         You can answer.
18         THE WITNESS:  Yes.
19 BY MS. VAN VLIET:
20     Q  Why -- well -- why?  If they want to object
21 they can.
22         Why did it strike you as odd?
23     A  Because there were no instructions on the
24 account to stop this from happening.
25     Q  Okay.

Page 87

1     A  Except a note being on the account.
2     Q  Except, I'm sorry?
3     A  A note being put -- a special instruction
4 being put on the account.
5     Q  And there was no such special instruction on
6 the account at that point in time, to the best of your
7 knowledge?
8     A  Before this letter?  No.
9     Q  Yeah.
10     A  No.
11     Q  Anything about the letter itself or what's
12 being promised in the letter that struck you as odd,
13 other than the fact that there was no notation on the
14 account to prevent -- or to effect the instruction in
15 the letter?
16         MR. CRAIG:  Form.
17         You can answer.
18         THE WITNESS:  Yes, because I personally had
19 no way of knowing if there was going to be any kind of
20 transactions done on this account elsewhere, besides
21 being done with me.
22 BY MS. VAN VLIET:
23     Q  Would putting a notation on the account, as
24 you've described, prohibit transactions on the account
25 being conducted elsewhere?

Page 88

1     A  No, because it could have been done via their
2 office, like their online capabilities.
3     Q  And when you say "their" office and "their"
4 online capabilities, who are you referring to?
5     A  RRA.
6     Q  Okay.  Did you ever see any other letters
7 like this with the same instructions relating to any
8 of the other RRA accounts apart from those you just
9 reviewed in Exhibit 60?
10     A  Yes.
11     Q  Do you recall what other investors you saw --
12 I'm going to refer to them for ease of reference as
13 lock letters.
14         Do you have that understanding?
15     A  Yes.
16         MS. EVANS:  I'm going to object to that.  Why
17 don't we refer to them generically as what they are,
18 which is letters.
19         MS. VAN VLIET:  Well, because there are a lot
20 of letters.
21         MS. EVANS:  I'm going to object to the term
22 being used.
23 BY MS. VAN VLIET:
24     Q  All right.  Then I will refer to them as
25 irrevocable instruction letters issued by -- or

22 (Pages 85 to 88)

**Page 137**

1  backtracking, the first e-mail on Exhibit 68, is an
2  e-mail dated November -- excuse me, September 24, 2009
3  from Mr. Mejia to customer service cash management,
4  copied to you, correct?
5    A  Correct.
6    Q  Mr. Mejia writes: "Attention Adam
7      "As per our conversation, our biggest
8  customer Rothstein Rosenfeldt Adler, P.A., Tax ID #,"
9  and then there is a portion redacted, "recently opened
10  three accounts that need to be added to their
11  TreasuryDirect. Accounts to be added," and then
12  there's three account numbers. "Your attention in
13  this matter is greatly appreciated. Sincerely," the
14  signature stamp for Ricardo Mejia, correct?
15    A  Correct.
16    Q  You respond to Mr. Mejia's -- I mean, you
17  received, rather, a response from that e-mail from CB
18  Notes Developer/Commerce Bank, correct?
19    A  Yes.
20    Q  I'm a little bit confused about this e-mail,
21  because it also then appears to be you on the
22  signature block of an e-mail to you.
23      Can you explain to me what's going on here in
24  this e-mail, the top e-mail?
25      MR. GOLDSTEIN: Objecting to form.

**Page 138**

1      THE WITNESS: The top of the e-mail looks
2  like I got an automated response, and it looks like I
3  had originally sent an e-mail, which is not showing on
4  here, to please also add to the wire module.
5  BY MS. VAN VLIET:
6    Q  But there's --
7    A  Yeah.
8    Q  Do you recall this?
9    A  No.
10    Q  Okay. Didn't make any sense to me. I was
11  just hoping you could explain it.
12      Do you recall toward the end of September of
13  2009 having any conversations with Spinosa about
14  getting approval for those irrevocable instruction
15  letters?
16      MR. GOLDSTEIN: Object to form.
17      THE WITNESS: No. No, I didn't even know
18  those letters were written, if they were written.
19  BY MS. VAN VLIET:
20    Q  Well, you testified that you had seen the one
21  that had been written on August 17, 2009 regarding
22  Coquina, correct?
23    A  Correct.
24      MR. HUTTON: Objection to form.
25      MR. GOLDSTEIN: Objection.

**Page 139**

1  BY MS. VAN VLIET:
2    Q  Was that your earlier testimony?
3    A  Yes.
4    Q  I'm talking about in September, September 30,
5  2009 --
6    A  Okay.
7    Q  -- okay, so that would be a month and change
8  after the one you had seen?
9    A  Correct.
10    Q  Did you ever have -- and that's the large,
11  and it's the fourth page, third and fourth pages in,
12  as I recall from your testimony, okay?
13    A  I thought you were referring to the ones
14  written by TD Bank. I apologize.
15    Q  Look at the fourth one in, and it's my
16  recollection that you testified that you had seen that
17  letter, correct?
18    A  Yes.
19    Q  Recognizing that you also testified that you
20  don't recognize Mr. Spinosa's signature and you don't
21  know whether that's his signature on the bottom, but
22  am I correct in my recollection that your testimony
23  was that you saw that letter?
24    A  Yes.
25    Q  Approximately a month and a couple weeks

**Page 140**

1  later, on September 30, 2009, or at any point around
2  there, do you recall ever having a conversation with
3  Frank Spinosa regarding needing to get approval for
4  such letters?
5      MR. GOLDSTEIN: Objection to form.
6  BY MS. VAN VLIET:
7    Q  Did you ever have such a conversation with
8  Frank Spinosa?
9      MR. GOLDSTEIN: Objection, form.
10      MS. VAN VLIET: Regarding getting approval of
11  the letters.
12      THE WITNESS: I had a conversation with Frank
13  Spinosa, but not with approval to the letters.
14  BY MS. VAN VLIET:
15    Q  Tell me about the -- first of all, when was
16  this conversation?
17    A  The conversation was around the first e-mail
18  that came out about the letter, where Frank wanted me
19  to put notes on the account, which was in August
20  sometime. I know there's e-mails somewhere here.
21    Q  Let me give it to you, because I don't want
22  you to -- look at Exhibit 59 and tell me if that's the
23  one you're referring to?
24    A  Yes.
25    Q  Okay. Go ahead.

Page 141

1    A  The conversation I had with Frank is, "We're
2  going to put these notes on the account, but how are
3  we going to monitor it?"
4    Q  Okay.  And what did Frank say?
5    A  Just put the notes on the account, and we
6  will move forward.
7    Q  Any further discussion at any point in time
8  with regard to whether the -- how the instructions
9  were going to be effectuated or monitored?
10   A  No.
11   Q  Did the subject of approval of this procedure
12 ever come up with Frank Spinosa in any communications
13 that you had with him?
14     MR. GOLDSTEIN: Objection.
15     THE WITNESS: No.
16 BY MS. VAN VLIET:
17   Q  Did Frank Spinosa ever express any discomfort
18 to you that he may have had with doing the letters?
19     MR. GOLDSTEIN: Objection.
20     MR. CRAIG: Form.
21     You can answer.
22     THE WITNESS: No.
23 BY MS. VAN VLIET:
24   Q  Did you, other than being concerned about the
25 ability to monitor the instructions, did you have any

Page 142

1  concern about putting the instructions in there?
2      MR. GOLDSTEIN: Objection.
3      THE WITNESS: No.
4  BY MS. VAN VLIET:
5    Q  What was your concern about monitoring?
6      MR. CRAIG: Form.
7      MR. GOLDSTEIN: Objection.
8      THE WITNESS: As I mentioned earlier, I
9  wouldn't be able to tell if there were transactions
10 being done without me knowing about it.
11 BY MS. VAN VLIET:
12   Q  Including from the customer's own desk, as I
13 recall; is that right?
14   A  Correct.
15     MR. GOLDSTEIN: Objection.
16 BY MS. VAN VLIET:
17   Q  Did you express that concern to Frank in
18 terms of your concern that you wouldn't even be able
19 to monitor if Rothstein himself was moving money
20 around?
21     MR. GOLDSTEIN: Objection.
22     MR. HUTTON: Objection.
23     MR. CRAIG: Form.
24     You can answer.
25     THE WITNESS: I don't think those words came

Page 143

1  out of my mouth.  The initial conversation was we have
2  no way of watching this, and I was told not to worry
3  about it.
4  BY MS. VAN VLIET:
5    Q  I understand that.
6      But did you say anything when you were
7  talking about that you had no way to watch it or
8  monitor it, whatever your word was, did you
9  specifically mention your concern that the customers
10 themselves, from their own online access, could
11 effectuate the transfer without monitoring?
12     MR. GOLDSTEIN: Objection.
13     MR. HUTTON: Object to form.
14     MR. CRAIG: Form.
15     THE WITNESS: I can't remember what the
16 actual conversation was.
17 BY MS. VAN VLIET:
18   Q  At any point in time, did you express that
19 particular concern that the customer themselves could
20 go around these instructions without you knowing it?
21     MR. GOLDSTEIN: Objection.
22 BY MS. VAN VLIET:
23   Q  Did you express that to anyone at the bank?
24     MR. GOLDSTEIN: Objection.
25     MR. CRAIG: Form.

Page 144

1      THE WITNESS: I didn't use those exact words,
2  but I did have a conversation with Frank when I got
3  this.
4  BY MS. VAN VLIET:
5    Q  I mean other than Frank --
6    A  No.
7    Q  -- that you just told me about?
8    A  No.
9    Q  Anybody else?
10   A  No.
11   Q  So Frank just told you, "Don't worry about
12 it, I'll take care of it," correct?
13   A  Correct.
14   Q  To the best of your knowledge, did he ever,
15 in fact, follow-up on your concern about the lack of
16 monitoring?
17     MR. GOLDSTEIN: Objection.
18     MR. HUTTON: Objection.
19     THE WITNESS: I'm not aware of it.
20     MR. CRAIG: We done with this?
21     MS. VAN VLIET: Yeah. I'm trying to do
22 things that won't run afoul of our issue.
23 BY MS. VAN VLIET:
24   Q  Now, you testified earlier at some point in
25 time, you don't recall when, Rothstein got

36 (Pages 141 to 144)

Page 177

1  UNITED STATES BANKRUPTCY COURT
   SOUTHERN DISTRICT OF FLORIDA
2     FORT LAUDERDALE DIVISION
3
      Case No. 09-34791-BKC-RBR
4
5  In re:
6  ROTHSTEIN ROSENFELDT ADLER, P.A.,
7     Debtor.
      _____/
8
9
10
11
12
13    GENOVESE JOBLOVE & BATTISTA, P.A.
      200 East Broward Boulevard, Suite 1100
14    Fort Lauderdale, Florida 33301
      Wednesday, June 9, 2010
15    2:40 a.m. to 4:15 p.m.
16
17       VOLUME II
18
      CONTINUED 2004 EXAMINATION
19
         OF
20
      ROSEANNE CARETSKY
21
      taken pursuant to notice
22    on behalf of Herb Stettin, Trustee.
23    . . . . .
24
25

Page 178

1   APPEARANCES:
2
    GENOVESE JOBLOVE & BATTISTA, P.A., by
3     THERESA VAN VLIET, ESQUIRE,
      DAVID C. CIMO, ESQUIRE and
4     JESUS SUAREZ, ESQUIRE
    on behalf of Herbert Stettin, Chapter 11 Trustee.
5
6     BILLING, COCHRAN,
      LYLES, MAURO & RAMSEY, P.A., by
7     W. TUCKER CRAIG, ESQUIRE
    on behalf of Roseanne Caretsky.
8
9     GREENBERG TRAURIG, P.A., by
      GLENN E. GOLDSTEIN, ESQUIRE,
10    JOHN HUTTON, ESQUIRE and
      DONNA EVANS, ESQUIRE
11    on behalf of TD Bank.
12
      SAMUEL J. RABIN, JR., P.A., by
13    SAMUEL J. RABIN, JR., ESQUIRE
    on behalf of Frank Spinosa.
14
15    SCHLESINGER & COTZEN, P.L., by
      MICHAEL COTZEN, ESQUIRE
16    on behalf of Frank Spinosa.
17
      TRIPP SCOTT, P.A., by
18    ROB N. HYMAN, ESQUIRE
    on behalf of Morse Operations and
19    Edward and Carol Morse.
20
      CONRAD SCHERER, ATTORNEYS AT LAW, by
21    JESSICA L. KAUFMAN, ESQUIRE
    on behalf of Razorback Funding, et al.
22
23
24
25

Page 179

1      KLUGER, KAPLAN, SILVERMAN,
       KATZEN & LEVINE, P.L., by
2      BRUCE A. KATZEN, ESQUIRE
     on behalf of Emess Capital.
3
4      GRAY ROBINSON, by
       HOWARD CAMERIK, ESQUIRE
5    on behalf of Jennifer Kersteter
6
7      . . . . . .
8
         I N D E X
9
10   WITNESS            DIRECT   CROSS
     ROSEANNE CARETSKY
11   By Ms. Van Vliet         180
     By Mr. Craig                  247
12
13      EXHIBITS MARKED FOR IDENTIFICATION
14      Number         Page
15       72            213
16
17
18
19
20
21
22
23
24
25

Page 180

1  Thereupon:
2        ROSEANNE CARETSKY,
3  after first being duly sworn, was examined and
4  testified under oath as follows:
5        DIRECT EXAMINATION
6  BY MS. VAN VLIET:
7    Q  Good afternoon, Ms. Caretsky.
8       MS. VAN VLIET:  Do you have everybody's
9  appearances?
10      THE COURT REPORTER:  I do.
11 BY MS. VAN VLIET:
12   Q  We're here today to continue and hopefully
13 complete, if we can get it done before 5:30, the 2004
14 Examination.
15      Among the areas that we didn't get into last
16 time --
17   A  Mm-hmm.
18   Q  -- were the training, experience, adhering to
19 bank policies and procedures, and that's an area the
20 Judge has now clarified that the trustee can make
21 inquiry about.
22      So I want to kind of go back and do some
23 general questions with you so I get a general
24 understanding of what your, first, your training was
25 starting at Commerce Bank and then at TD Bank,

OUELLETTE & MAULDIN COURT REPORTERS, INC.
(305) 358-8875

Page 205

1  room, I can let them use the conference room.
2    Q  So it's totally discretionary on the
3  manager's part; is that right?
4    A  Correct.
5    MR. GOLDSTEIN: Objection.
6  BY MS. VAN VLIET:
7    Q  Well, is that your understanding, that --
8    MR. GOLDSTEIN: Objection.
9    MS VAN VLIET: -- it's discretionary on the
10  part of the manager?
11    THE WITNESS: To my knowledge --
12    MR. GOLDSTEIN: Objection.
13    THE WITNESS: -- yes.
14  BY MS. VAN VLIET:
15    Q  Do you recall testifying about seeing, when
16  you were out on personal leave, on August 17th, I
17  believe, a lock letter?
18    A  Yes.
19    Q  Do you remember that testimony?
20    A  Yes.
21    MR. GOLDSTEIN: Object to the form.
22  BY MS. VAN VLIET:
23    Q  Had you ever -- while I'm looking for the
24  exhibit number -- had you ever seen such a letter
25  before?

Page 206

1    MR. CRAIG: Has it got a Bate stamp at the
2  bottom?
3    MS. VAN VLIET: I had marked it as an
4  exhibit. I just don't --
5    MR. CRAIG: Okay. It's part of a composite,
6  right?
7    MS. VAN VLIET: I do not remember.
8    THE WITNESS: It's here.
9    MR. CRAIG: You got it?
10    THE WITNESS: Yes.
11    MS. VAN VLIET: Here it is. It's Exhibit 60.
12    THE WITNESS: Yeah, it's the third page.
13    MS VAN VLIET: And it's the third page in.
14  It's Bate stamped --
15    (Thereupon, Mr. Katzen entered the conference
16  room, and there is an informal discussion off the
17  record.)
18  BY MS. VAN VLIET:
19    Q  Do you remember testifying about this?
20    A  Yes.
21    Q  It's my recollection -- you know what, rather
22  than trying to shortcut it, let me just -- it's my
23  recollection that you testified when you saw this you
24  had some concerns about being able to monitor the
25  representation made in this letter, am I right?

Page 207

1    MR. GOLDSTEIN: Object to form.
2    MR. CRAIG: Join.
3    THE WITNESS: Well, I just had a concern with
4  that he was able to do transactions on the account
5  himself, rather than me being able to monitor
6  everything through a branch.
7  BY MS. VAN VLIET:
8    Q  When you say that "he" was able to do
9  transactions himself, are you referring to
10  Mr. Rothstein?
11    A  Yes.
12    Q  And had you ever seen a letter like this
13  given by the bank to a customer before?
14    MR. GOLDSTEIN: Object to the form and asked
15  and answered.
16    THE WITNESS: No.
17  BY MS. VAN VLIET:
18    Q  Now, what about your inability to monitor the
19  activity, all potential activity, in the account
20  caused you concern?
21    MR. CRAIG: Form.
22    You can answer.
23    MR. GOLDSTEIN: Same objection.
24    THE WITNESS: The concern would be that if he
25  was to go somewhere, another branch, that didn't know

Page 208

1  the account, that there may be a transaction done on
2  it.
3  BY MS. VAN VLIET:
4    Q  Okay. And was that your only concern?
5    A  Yes.
6    Q  That a transaction could be conducted at an
7  another branch?
8    A  Correct. Because there were only notes on
9  the account.
10    Q  Didn't Mr. Rothstein have the ability to
11  conduct transactions at his desk?
12    A  Yes.
13    Q  And he had that ability at that time, did he
14  not?
15    A  Correct.
16    Q  Would you have been able to monitor that kind
17  of transaction?
18    A  His own transactions?
19    Q  Mm-hmm.
20    A  No. Unless I sat there and looked at his
21  account all day to see if there was anything done, but
22  no.
23    Q  Have you ever sat --
24    A  No.
25    Q  -- and looked at somebody's account all day?

8 (Pages 205 to 208)

Page 209

1   A   No, no.
2   Q   And would I be fair in saying that if you
3   were sitting there looking at somebody's account all
4   day, you would doing it because something unusual was
5   going on on there and you knew that?
6   A   Yes.
7       MR. GOLDSTEIN:  Object to the form.
8   BY MS. VAN VLIET:
9   Q   That didn't happen in this case, right?
10  A   No.
11  Q   So would the fact that Mr. Rothstein,
12  through -- which program was it?  I can't remember
13  now.
14      Was it TreasuryDirect or BusinessDirect that
15  let -- or Encore, not Entourage?
16  A   He had access to both.
17  Q   Okay.  But which of the programs permitted
18  him -- did both of the programs permit him to make
19  transactions at his desk?
20      MR. GOLDSTEIN:  Objection to the form.
21      THE WITNESS:  Yes, they could.
22  BY MS. VAN VLIET:
23  Q   So was the fact that the bank's programs
24  permitted the customer him or herself to make the
25  transaction, was that an additional concern that you

Page 210

1   had at this time about this letter?
2       MR. GOLDSTEIN:  Form.
3       MR. CRAIG:  Form.
4       THE WITNESS:  Well, it was his account, so
5   that wasn't so much my concern as somebody reading the
6   notes on the account elsewhere.
7   BY MS. VAN VLIET:
8   Q   Okay.  But what was your understanding of
9   what Frank was to promise in this letter?  Which, by
10  the way, you -- actually go to the third page, because
11  that's the one where he actually counter signed, next
12  page -- I'm sorry, the fourth page.
13  A   I just want to read it.
14  Q   Sure.
15  A   Okay.  So your question to me was, what is
16  this letter asking to be done?
17  Q   What is it your understanding that when Frank
18  Spinosa, Regional Vice President, counter signs and
19  agrees to on the bottom left-hand side of the page --
20  what is it your understanding that he's agreeing to
21  do?
22      MR. CRAIG:  Form.
23      MR. COTZEN:  Objection.
24      MR. GOLDSTEIN:  Objection.
25      MS VAN VLIET:  Answer.

Page 211

1       THE WITNESS:  According to the letter, the
2   only -- all the transaction -- any -- I'm sorry, that
3   any distribution be sent to Coquina Investments.
4   BY MS. VAN VLIET:
5   Q   And that all funds contained in that account
6   shall only be distributed upon his instructions, am I
7   right?
8       MR. GOLDSTEIN:  Objection.
9       MR. CRAIG:  Form, to the extent the letter
10  speaks for itself.
11      MR. COTZEN:  Form.
12      MR. CRAIG:  You can answer.
13      THE WITNESS:  Yes.
14  BY MS. VAN VLIET:
15  Q   Was it at all a concern to you that someone
16  with access to BusinessDirect, TreasuryDirect or
17  Encore, or whichever program you were dealing with at
18  the time, whether it was Commerce or TD Bank, someone
19  with access to that on behalf of RRA could move money
20  directly without you monitoring it?
21      MR. GOLDSTEIN:  Objection.
22      MR. CRAIG:  Objection to form.
23      You can answer.
24      THE WITNESS:  That wasn't a concern, no,
25  because it's his account.

Page 212

1   BY MS. VAN VLIET:
2   Q   Okay.  Well, who else at RRA had access to
3   and ability to move money in the accounts, apart from
4   Mr. Rothstein himself?
5       MR. GOLDSTEIN:  Objection.
6       MR. CRAIG:  Are we referring to this specific
7   account here?
8       MS VAN VLIET:  I'm referring to this specific
9   account.
10      THE WITNESS:  Yeah, I couldn't tell you
11  offhand.  Whoever had authority who signed on the
12  account.
13      (Inaudible discussion off the record between
14  Ms. Van Vliet and Mr. Suarez.)
15  BY MS. VAN VLIET:
16  Q   I believe you testified previously that to
17  your knowledge Stuart and Scott, at a minimum, were
18  signatories on all the accounts; is that right?
19      MR. GOLDSTEIN:  Objection.
20      THE WITNESS:  On most of the IOLA -- I should
21  say on all the IOLA accounts the attorneys had to
22  sign.
23  BY MS. VAN VLIET:
24  Q   And I believe you previously testified that
25  in addition Mr. Brock, whose formal name is escaping

9 (Pages 209 to 212)

Page 213

1  me at the moment, was also a signatory on some
2  accounts, correct?
3      MR. GOLDSTEIN: Objection.
4      THE WITNESS: Operating accounts, yes.
5  BY MS. VAN VLIET:
6    Q  Now, was there any account that only Scott
7  Rothstein was a signator on?
8      MR. GOLDSTEIN: Objection.
9      THE WITNESS: I can't tell you yes or no. I
10 don't recall. I would have to look at the signature
11 cards.
12 BY MS. VAN VLIET:
13   Q  Okay. Here we go.
14     MS. VAN VLIET: I think we're at 71?
15     MR. GOLDSTEIN: Yes.
16     MR. CRAIG: As far as Caretsky's transcript.
17     MS. VAN VLIET: Seventy-one.
18     THE COURT REPORTER: This will be 71?
19     MR. GOLDSTEIN: Seventy-two.
20     MS VAN VLIET: I'm sorry, 72.
21     (Thereupon, the documents referred to were
22 marked as Exhibit No. 72 for identification.)
23     MR. GOLDSTEIN: Theresa, are you making this
24 a composite exhibit?
25     MS. VAN VLIET: Yes, I am, and I'm giving her

Page 214

1  time to look through it.
2      Well, apparently, all the account information
3  we got from the bank, this account is not in there.
4      MR. CRAIG: The one referenced in the August
5  17th --
6      MS. VAN VLIET: Mm-hmm.
7      (Discussion off the record.)
8  BY MS. VAN VLIET:
9    Q  Ms. Caretsky, it's not there. It's not among
10 the ones sent to us.
11   A  Okay.
12   Q  Okay. So your only concern -- I shouldn't
13 say your "only" concern.
14     The concern that you remember at the time was
15 that there were no written instructions on the account
16 that preclude -- or clued another branch in from
17 taking an action that would be in contravention of
18 this direction?
19   A  No, there --
20     MR. GOLDSTEIN: Objection to form.
21     MR. CRAIG: Form.
22     You can answer.
23     THE WITNESS: After this there was notes put
24 on this account for this reason.
25 BY MS. VAN VLIET:

Page 215

1    Q  No, I know that.
2      But the reason that the notes were put on
3  there was because you had the concern, correct,
4  because the notes weren't on there to begin with?
5      MR. GOLDSTEIN: Objection.
6      MR. CRAIG: Form.
7      THE WITNESS: Right. I was asked to put the
8  notes on the account, yes.
9  BY MS. VAN VLIET:
10   Q  Who asked you to put the notes on the
11 account?
12   A  It came from Frank.
13   Q  When you testified previously, I believe you
14 testified that you expressed a concern to Frank about
15 your lack of ability to monitor, correct?
16     MR. GOLDSTEIN: Form.
17     MR. CRAIG: Form.
18     You can answer.
19     MR. COTZEN: Form.
20     THE WITNESS: I don't believe it was my
21 ability to monitor.
22 BY MS. VAN VLIET:
23   Q  A lack of the bank's ability to monitor?
24   A  To monitor, right.
25   Q  And it's my recollection that he told you

Page 216

1  that he would take care of it, correct?
2    A  Correct.
3      MR. GOLDSTEIN: Objection.
4  BY MS. VAN VLIET:
5    Q  What, to your understanding, did he do to
6  take care of it?
7      MR. COTZEN: Objection.
8      MR. GOLDSTEIN: Objection.
9      THE WITNESS: I can't answer that. I don't
10 know.
11 BY MS. VAN VLIET:
12   Q  Did you ever follow-up?
13   A  No, I did not.
14   Q  Was the commitment made on behalf of the bank
15 in this counter signed letter on August 17, 2009, was
16 that unusual?
17     MR. CRAIG: Form.
18     MR. GOLDSTEIN: Objection to form.
19     THE WITNESS: Was what unusual?
20 BY MS. VAN VLIET:
21   Q  Was the commitment made on behalf of the bank
22 by virtue of Mr. Spinosa's signature on this August
23 17th letter, was that unusual in your experience?
24     MR. GOLDSTEIN: Objection to form.
25     MR. CRAIG: Form.

10 (Pages 213 to 216)